**SHAWMUT INN,**

v.

**INHABITANTS OF the TOWN OF KENNEBUNKPORT et al.**

Supreme Judicial Court of Maine.

Argued Nov. 13, 1979.

Decided April 14, 1981.

---

**6.** The maximum prison sentence for a Class D crime is less than one year. 17–A M.R.S.A. § 1252(2)(D).

385

Drummond & Drummond, John B. Emory, Portland (orally), for plaintiff.

Wilson, Steinfeld & Murrel, Henry Steinfeld, Portland, Lane & Johns, Charles A. Lane, Portland (orally), for Town of Kennebunkport.

G. Arthur Brennan, Dist. Atty., Joseph A. Wannemacher, Asst. Dist. Atty., Sheila Fine, Law Student, Alfred (orally), for County Commissioners.

Before McKUSICK, C. J., and POMEROY,* WERNICK, GODFREY, NICHOLS and GLASSMAN, JJ.

NICHOLS, Justice.

Once again on this appeal our Court is confronted with an issue as to the assessment of real estate for local property taxation.

Pursuant to 36 M.R.S.A. § 844 and M.R. Civ.P. 80B the Plaintiff, Shawmut Inn, appeals from the refusal of the Superior Court (York County) to order any abatement of a portion of the tax assessed upon its oceanfront resort by the Town of Kennebunkport as of April 1, 1975. The Plaintiff asserts that when professional appraisers, who were retained by the Town, used a single appraisal method, "reproduction cost less depreciation," in arriving at its valuation, and the municipal assessors adopted the professionals' valuation, it resulted in a substantial overvaluation of the Plaintiff property in violation of the assessors' duty to determine "just value" of the property.

The subject premises is a seasonal resort facility. It consists of a large main building, a number of cottages and a 20-unit motel situated on approximately 25 acres of land fronting on the Atlantic Ocean.

In April, 1974, the Town of Kennebunkport contracted with the Massachusetts appraisal firm of Whipple-Magane-Darcy, Inc., to make "a complete appraisal and reevaluation for tax assessment purposes of all real and personal property in Kennebunkport." The appraisal firm contracted to furnish to the assessors "full information concerning the appraisals and valuation

made by it, the methods used and the procedures followed." The contract further provided that:

> The appraisal company shall make careful investigation of the market value of all classes of land. Owners, realtors, banks and other informed sources shall be asked to supply information relative to sales of property within the area covered by these specifications. The appraisal company shall furnish to the Assessors for their information and further reference the detailed data which were used to arrive at the units of land value and which serve to substantiate these values, . . . .

With reference to residential property the contract provided:

> The appraisal company shall record the type and quality of construction by component parts such as foundation, basement, framing, floors, interior trim, exterior trim, roof, heating, plumbing, lighting extras, such as fireplaces, etc., and substandard physical features, number of rooms, age, number of stories, physical, functional and economic depreciation factors, rent, if rented, and sales data that may be obtainable. In addition, all such other pertinent factors as may contribute or detract from value shall be noted. Seasonal properties will be seasonally checked.

Further, with reference to commercial and special purpose buildings, the contract provided:

> The appraisal company shall measure accurately these buildings and shall keep a similar record with respect to their component parts as in the case of residences. Depreciation shall be determined from conditions, functional utility and location. *Earnings shall be considered as a check against depreciated cost where this process may be applicable.* (emphasis supplied)

In the course of its performance of that contract the appraisal firm proposed valua-

---

* POMEROY, J., sat at oral argument and participated in the conference but retired prior to the preparation of the opinion.

tions aggregating $1,679,600 on the Shawmut Inn's real estate. The assessors adopted those valuations, without change, for its 1975 assessment.

On April 3, 1975, the Shawmut Inn's present stockholders (then minority stockholders) purchased for $830,000 the remaining corporate stock which at that time was owned by the Estate of Frank J. Small. The principal asset of the corporation was the real estate, and an independent appraisal, made in conjunction with the purchase of stock, placed a total value of $677,605 on the Shawmut Inn's real estate.

With this appraisal in hand Shawmut Inn applied to the town assessors pursuant to 36 M.R.S.A. § 841 for an abatement of so much of its tax as reflected a valuation in excess of the sale price of the stock.

The town assessors granted a reduction of $152,800 on the valuation placed on the Shawmut Inn property.

A seasonable appeal by Shawmut Inn to the County Commissioners of York County pursuant to 36 M.R.S.A. § 844 and a hearing before the County Commissioners produced no further change in the valuation placed on the subject premises.

On December 23, 1976, Shawmut Inn appealed the County Commissioners' decision to the Superior Court. Months later that Court remanded the matter to the County Commissioners to establish a sufficient record for appellate review.

During two days of testimony in the hearing which ensued, the County Commissioners heard testimony as to appraisal methods commonly used to determine the value of commercial property, and as to methods used in reaching the values placed on the Shawmut Inn by the local assessors and by the taxpayer. Significantly, no evidence was offered as to the specific methodology employed by the professional appraisal firm which had developed the valuation initially placed by the assessors on the real estate in question.

The Town offered the testimony of a professional appraiser, Albert Scrontras, who could say that he had thoroughly examined the property and had checked the "Assessors' Cards" which the appraisal firm had prepared on each segment of the property. It was Scrontras' testimony that he found no evidence of the use by that firm of any approach other than "replacement cost less depreciation" in revaluing property in Kennebunkport. It was Scontras' opinion that the assessed value placed on the Shawmut Inn holdings represented the just value of the property.

The Shawmut Inn called as its principal witness before the County Commissioners Albert J. Childs, whose 1974 appraisal had established the sale price of the Inn on April 3, 1975. He testified that use by the appraisal firm of the "reproduction cost less depreciation" method had resulted in a substantial overvaluation of the property in 1975. It was Childs's opinion that "market data" and "capitalization of income" approaches would result in a more reasonable estimate of just value of the Shawmut Inn property.

When the record thus made before the County Commissioners came up for review by the Superior Court that Court, relying upon *Frank v. Assessors of Skowhegan*, Me., 329 A.2d 167 (1974), concluded that there was no showing that the appraisal techniques relied upon by the Kennebunkport assessors amounted to an intentional violation of the essential principle of practical uniformity, and further concluded that the valuation arrived at by the local assessors was not unreasonable.

The case comes here on appeal by the taxpayer.

## I. Dismissal as to the Administrative Tribunals

■ Before reaching the merits of this appeal, we observe at the outset that this case must be dismissed as to the Defendants, Assessors of the Town of Kennebunkport and the Commissioners of the County of York. The taxpayer and the municipality are the proper adversaries in tax abatement proceedings in the courts. *Assessors, Town of Bristol v. Eldridge*, Me., 392 A.2d 37, 39–40 (1978). M.R.Civ.P. 80B requires

notice to any administrative agency whose decision is being reviewed in the courts but, absent some statutory provision to the contrary, this requirement of notice does not make the agency a party to the proceeding in Superior Court.

We now reach the merits of Shawmut Inn's appeal. The Inn contends both that (a) the method of valuing its property was unlawful and that (b) by the use of that method, the property was overvalued. Faced with a similar double-barreled attack on the validity of a tax assessment, we recently concluded that proving one of these points would entitle the taxpayer to an abatement. *See Farrelly v. Inhabitants of the Town of Deer Isle*, Me., 407 A.2d 302, 306 (1979).

We must determine whether the conclusions reached by the Superior Court were erroneous as a matter of law. Specifically, on this appeal we must determine:

(a) Whether the court below erred in ruling as a matter of law that the appraisal approach used by the professional appraisers did not violate the constitutional mandate of equality; and

(b) Whether the court below erred in ruling that the value reached by the assessors was not so unreasonable in light of the circumstances that the property was substantially overvalued and injustice resulted.

## II. Appraisal Method

This case presents a question almost identical to one we addressed in *Frank v. Assessors of Skowhegan*, Me., 329 A.2d 167 (1974). There, as here, the "reproduction cost less depreciation" method of appraisal was employed uniformly in revaluing all real property (in Skowhegan), including residential, commercial and industrial land and buildings. There the taxpayer argued that the assessors violated their obligation to assess justly and equally when they assessed his income-producing property by the "cost" method to the exclusion of the "capitalization of income" approach. He argued that the lower court's refusal to give any weight to his evidence of the income approach was error of law. *Id.* at 174.

Shawmut Inn's complaint is much the same in the present case. Its argument is that if the expert appraisers had valued its property by more than one appraisal method and then correlated the results, they would have found the value calculated by the "cost" approach to be excessive. The taxpayer further argues that the sale of corporate stock in the Inn only three days after the tax valuation date at a price which reflected a total value less than half the assessed value is proof that the appraisal method was invalid and the assessment was unjust. The significant difference here is that the mass revaluation of all the property in Kennebunkport was not done by the town assessors, but by a professional appraisal firm. That firm's valuations were then adopted by the local assessors.

■ In our State the tax assessors are under both a constitutional and statutory obligation to determine the "just value" of taxable property. Me.Const., art. 9, § 8 [1], 36 M.R.S.A. § 201. [2] "Just value" is the equivalent of "market value." *Sweet, Inc. v. City of Auburn*, 134 Me. 28, 180 A. 803 (1935); *Frank v. Assessors of Skowhegan, supra*, 329 A.2d at 173. Although the Legislature has established "minimum assessing standards" with which the assessors must comply, 36 M.R.S.A. § 327, it has stopped short of setting forth in the statutes the different methods which local assessors may

---

1. Me.Const., art. 9, § 8 mandates that:

    All taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally, according to the just value thereof.

2. 36 M.R.S.A. § 201 states:

    The State Tax Assessor shall have and exercise general supervision over the administration of the assessment and taxation law of the State, and over the local assessors and all other assessment officers in the performance of their duties, to the end that all property shall be assessed at the just value thereof in compliance with the laws of the State.

utilize to achieve such results. 36 M.R.S.A. § 326.[3]

Likewise, this Court has permitted the local assessors considerable leeway in choosing the method or combinations of methods to achieve just valuations. We have found acceptable as techniques to aid local assessors at least three standard appraisal methods of determining the market value of real property: (1) the "comparative" or "market data" approach, (2) the "income" or "capitalization" approach, and (3) the "reproduction cost less depreciation" or "cost" approach. *See, e. g., Sweet, Inc. v. City of Auburn*, 134 Me. 28, 32, 180 A. 803, 804 (1935); *Kittery Electric Light Co. v. Assessors of the Town of Kittery*, Me., 219 A.2d 728, 737 (1966); *see generally* Comment, *The Road to Uniformity in Real Estate Taxation: Valuation and Appeal*, 124 U.Pa. L.Rev. 1418, 1430–40 (1976).

Theoretically, all three methods are employed in any appraisal, but often only one or two are useful or even usable in a given appraisal, depending upon its nature and purpose. *See Maine Bureau of Taxation Assessment Manual* 7–9 (rev. ed. Nov. 1977).

In *Frank v. Assessors of Skowhegan, supra*, we affirmed the Superior Court's decision that in revaluing all the property in Skowhegan, the local assessors' use of the single "cost" method was not unreasonable. We did so even though we recognized that the single method may not render the most accurate figure for market value for every piece of property. We concluded that the "cost" approach was well suited to the need of a municipality to have a stable income:

It seems to us plaintiff, in effect, is saying that a willing purchaser will pay for income-producing property only that

price which is justified by the income produced at or just prior to the time of purchase. Income from rental property is peculiarly subject to the influence of temporary general economic conditions. If we carry, what seems to be plaintiff's argument, to its logical conclusion, tax assessors would be required to down value income-producing property each time there is even a temporary economic decline.

We cannot accept this reasoning.

Stability in municipal income is a factor which must always be considered. To require owners of property which is not income-producing to pick up the deficiency resulting from reducing the tax burden of income property owners each time there is a temporary downward trend in the economy, would surely not be either feasible or equitable.

The assessors ought not be required to treat this plaintiff differently because his property is not for the time being producing the rate of return on his investment which was anticipated.

". . . assessors should recognize that the true value of a fixed asset, such as real estate, is fairly constant and must be gauged by conditions, not temporary and extraordinary, but by those which over a period of time will be regarded as measurably stable." *Sweet, Inc. v. City of Auburn*, 134 Me. at 32, 180 A. at 804. *Id.* at 175.[4]

Our decision to allow the single "cost" approach in *Frank* was also based in part upon recognition that the general revaluation in Skowhegan was performed by semi-skilled local assessors. We stressed that in carrying out their constitutional duty to assess all property fairly and according to

---

**3.** 36 M.R.S.A. § 326 provides:

The purpose of minimum assessing standards is to aid the municipalities of Maine in the realization of just assessing practices without mandating the different ways municipalities might choose to achieve such equitable assessments.

**4.** We note in passing that the State Bureau of Taxation recognizes the same practical considerations. The Bureau advises local assessors

that the method best suited to the requirements of a mass revaluation program is "cost of reproduction less depreciation." *See Maine Bureau of Taxation Assessment Manual* 9 (rev. ed. 1977). Any piece of property except for land can be valued in terms of its depreciated replacement cost. The use of this method, therefore, is most convenient where large numbers of properties must be revalued over a relatively short period of time.

just value, the local assessors must rely to a certain degree upon guesswork and estimation:

> In actual practice assessors are not always men of special training or skills, especially in the smaller cities and towns. They are public officers who usually bring to their job the intelligence, experience, and judgment of ordinary individuals whose knowledge of property values derives from their having lived and moved and had their being in the community the property of which they are evaluating. *Frank v. Assessors of Skowhegan, supra* at 171.[5]

Nonetheless, contrary to Kennebunkport's argument here, *Frank* does not stand for the proposition that the use of the single "cost" approach in valuing income-producing property will always be acceptable.

■ In the first place, in terms of any particular piece of property, use of this single approach could result in an unjust valuation, particularly since the cost approach may render the highest valuation figure of the three standard appraisal methods. *G.R.F., Inc. v. Board of Assessors*, 41 N.Y.2d 512, 514, 393 N.Y.S.2d 965,

362 N.E.2d 597, 599 (1977). Where the single method is found to have led to an unjust valuation, it will not be accepted, and the assessors will have to resort to an alternate approach. *Frank v. Assessors of Skowhegan, supra*, 329 A.2d at 175.

In the second place, where, as here, the local assessors have contracted with professional appraisers, the taxpayer may rightly expect the value placed on his taxable property to be computed by means of more sophisticated appraisal techniques.

In the third place, as the local assessors become more highly skilled through the certification and training procedures now mandated by our Legislature, it well may be that we must evaluate the accuracy of their work by a higher standard than we have applied in the past.

Generally accepted appraisal practice recognizes a process known as "correlation" as the best mechanism for obtaining an accurate figure for market value. To correlate, an appraiser must calculate value by two or more appraisal methods and then weigh the factors used in arriving at each value to determine which method best reflects the market value.[6] *See Medical Building Land*

---

5. By the enactment of P.L.1973, c. 620, § 10, and the amendments thereto, the Legislature has taken steps to eliminate non-expert valuations and to alleviate assessment inequality. The Act provides for the training and certification of municipal assessors under the direction of the State Tax Assessor. It also authorizes the Bureau of Taxation to provide aid and advice to local assessors in the form of manuals, maps, standardized assessment forms, statistical tables and training programs to instruct on scientific methods of appraisal. *See* 36 M.R.S.A. §§ 301 *et seq.*

6. The process of correlation has been defined and explained as follows:

> The term "correlation" implies a reciprocal relation and interdependence of functions— that is, an orderly connection of related elements. In the appraisal process, under the three-approach concept of value, correlation refers to the problem of bringing into focus the varying estimates of value arrived at by two or all of the three approaches—the Market Approach, the Income Approach, and the Cost Approach. The appraiser makes a thorough study of all pertinent information gathered by him, and analyzes and weighs the strongest and most applicable data under

each approach. The final conclusion as to value is based on the approach which is supported by the most convincing data, that is, the *primary* approach. The accuracy of this estimate is checked by the results reached under the other approaches used, the *secondary* approaches.

. . . .

> In every appraisal, a vast amount of data must be sifted, analyzed, and related to the subject property before a final estimate of value can be made. The purpose of correlation is to boil down this information and to choose the basic and fundamental facts that give the greatest support to an estimate arrived at by a particular approach.

> In applying any approach to value, the appraiser makes certain assumptions based on observation and sound reasoning. Each approach rests to some extent upon *opinion* evidence. The task of the appraiser in correlation is to seek out the approach that is supported by a preponderance of "factual" evidence. An approach that lacks support of a quantity of important factual data rests to a greater degree on opinion evidence. All available data for each approach must be processed, even if it may seem that an ap-

*Company v. Department of Revenue,* 283 Or. 69, 71–73, 582 P.2d 416, 418–419 (1978); *Petition of Mallory,* 127 Vt. 412, 419, 250 A.2d 837, 841 (1969).

▪ It is not for us to mandate the use of any single appraisal method in valuing commercial or any other taxable property. We do not adopt Shawmut Inn's argument, for instance, that the "cost" approach is not suitable for valuing commercial property. It is for the local assessors or professionals hired by them to determine in the first instance the best method or methods of arriving at a just value in compliance with the Constitution and laws of this State. We do, however, expect professional assessors or appraisers hired by the local assessors to utilize the scientific appraisal techniques developed by their profession.

▪ We conclude, therefore, that where professional appraisers choose the "cost" approach as a starting point for a general revaluation, they should use other appraisal methods as checks in testing the reasonableness of such values as may appear questionable. The process of "correlation" can be particularly useful in valuing a commercial property like the Shawmut Inn.

▪ It is well settled that the petitioner for an abatement of taxes has the burden of showing that the assessment method is not in conformity with the law. *Farrelly v. Inhabitants of the Town of Deer Isle, supra* at 306.

In the case before us, we are unable, unfortunately, to evaluate the work done by the professionals from Whipple-Magane-

Darcy Inc. No one from that firm was produced as a witness at the hearings before the York County Commissioners. The only evidence on the valuation method that firm may have used came from the Town's witness, Scrontras. He testified that from his examination of the "Assessors' Cards" prepared by them it was his conclusion that the appraisal firm employed only the "cost" approach. Nevertheless, this witness was examining only the end product of Whipple's appraisal work. The "Assessors' Cards" do not tell us whether the professional correlated the values of more than one appraisal method before arriving at a final valuation. It is possible that the appraisal firm correlated and chose the "cost" value as representative of market value, even as the "cost" approach was chosen by the Town's witness, Scrontras, over the "income" and "market" approaches.

▪ The "cost" approach is not *per se* unsuitable for valuing commercial property. Without knowing the process by which the appraisal firm chose to value the Shawmut Inn property at "cost less depreciation," we cannot say that the process failed to conform to the requirements of the law.[7]

▪ Even though local assessors may hire professionals to calculate property values, the constitutional obligation to assess according to just value still rests with the assessors. Where the assessors adopt *in toto* the professionals' valuation recommendations, they in effect adopt the methods by which the appraisers reached their conclusions. This is the argument pressed by Shawmut Inn in its attack upon the valua-

---

proach is relatively weak and less supportable than other approaches. The process of relating, weighing, and analyzing the data must go on within the development of each estimate of value.

Value can never be calculated by adding up the several estimates arrived at in processing various approaches and taking an average of these estimates. Averages do not lead to a sound conclusion as to value; if an error was committed in estimating under any one of the approaches, it would merely be carried forward in a final estimate by average. Sarles, *Correlation, Analysis, and Conclusion as to Value,* in *Encyclopedia of Real Estate Ap-*

*praising* 120–21 (Friedman ed. 1968) (emphasis in the original).

7. The testimony of Raymond E. Mailhot, Treasurer of the Shawmut Inn, indicates that Whipple may have considered the income approach in valuing the Shawmut Inn property. Mailhot testified that a representative from Whipple asked for the books of the corporation. Mailhot referred him to the executor of the estate of Frank Small, who later asked for and received from Mailhot the financial statements of the corporation. The record does not indicate whether the statements were in fact delivered to Whipple.

tion which the Kennebunkport assessors placed on its property. Significantly, however, the ultimate valuation being challenged on this appeal was a figure to which the local assessors reduced Shawmut Inn's valuation. The Inn, therefore, must establish that the method or methods used at arriving at the ultimate valuation do not pass constitutional and statutory muster.[8]

■ It is imperative that local assessors keep themselves informed as to the methods used by the professionals they hire, and that they use their own knowledge of local conditions to check the accuracy of the professional appraisers' recommendations.

■ Even though the Kennebunkport assessors initially accepted the values recommended by the Whipple firm for the Shawmut Inn property, when the Plaintiff petitioned for a tax abatement, the assessors went to the site and examined the land and buildings of Shawmut Inn, checking for themselves the valuations listed on each of the "Assessors' Cards." They then reduced the valuation per acre on the golf course from $12,000 to $5,000 and deducted 25% from the value of another section of land because of a restrictive covenant which the professionals had apparently overlooked. They granted a reduction in valuation totaling $125,000.

We cannot conclude that the appraisal method used here was inherently discriminatory where the assessors checked the recommended valuations against their own independent knowledge of the community's property values and granted reductions in valuation where they found the figures excessive. We find no evidence of a

> conscious failure to exercise a fair and impartial judgment, or a conscious resort to arbitrary methods, different from those employed in assessing other property of like character and situation, thereby

resulting in imposing an unequal burden on property .... *Farrelly v. Inhabitants of the Town of Deer Isle, supra,* 407 A.2d at 307.

In sum, Shawmut Inn has failed to sustain its burden of proving that the system by which the assessment was made violated the principle of equality mandated by the Maine Constitution.

### III. The Reasonableness of The Assessed Value

Shawmut Inn further challenges the 1975 assessment of its property upon the grounds that, assuming that the appraisal techniques utilized that year by the local assessors were valid, their conclusion as to the valuation of the Shawmut Inn property is unreasonable because it was not supported by competent evidence. Specifically, the Plaintiff contends that its property was valued in excess of its just value because the assessors failed to consider a number of important factors.

Three of the arguments advanced by the Plaintiff merit discussion.

■ A presumption of good faith and conformity to the requirements of the law attaches to assessors' work. *Sweet, Inc. v. City of Auburn, supra,* 134 Me. at 33, 180 A. at 805; *Frank v. Assessors of Skowhegan, supra* at 171. To overcome this presumption, the taxpayer must show that the judgment of the assessors as to the amount of the tax was irrational or

> so unreasonable in the light of the circumstances that the property is substantially overvalued and an injustice results, or that there is an unjust discrimination, or that the assessment was in some way fraudulent, dishonest or illegal. *Sears, Roebuck & Co. v. Inhabitants of the City of Presque Isle,* 150 Me. 181, 189, 107 A.2d 475, 479 (1954).

---

8. The method of valuation and just value are intimately related. In *Farrelly v. Inhabitants of the Town of Deer Isle,* 407 A.2d 302 (1979), we ruled that an inherently discriminatory method of valuation cannot produce a just result, even though it is possible that in valuing the property by a proper *method,* the assessors may by chance arrive at the same result. But in spite of the *apparent* just value determined by the invalid method, we have concluded that the taxpayer is harmed, nonetheless, by the mere use of the improper appraisal method. *Id.* at 306.

Initially Shawmut Inn argues that in determining value by the "cost" approach, the assessors failed to adequately depreciate the property. It points out that according to the "Assessors' Cards," reductions from cost were given for physical depreciation and functional obsolescence, but that no reduction was given for economic obsolescence. The Town's witness, Scrontras, testified that the "one" factor reflected on the "Assessors' Cards" next to the space for economic obsolescence indicates that the assessors considered, but gave no value to, that depreciation factor.

The contention of Shawmut Inn is that in valuing property by the "cost" method, a reduction *must* be given for economic obsolescence and that where such a reduction is not given, the assessed value is necessarily in excess of the just value of the property. We do not agree.

■ Depreciation, like the market value of property, cannot be proved with mathematical certainty and must ultimately remain in the realm of opinion, estimate and judgment. *Kittery Electric Light Co. v. Assessors of the Town of Kittery, supra,* 219 A.2d at 738. We reaffirm the principle that

> The proving of a mere error of human judgment, . . . will not support a claim of overrating; 'there must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity.' *Shawmut Manufacturing Co. v. Town of Benton,* 123 Me. 121, 130, 122 A. 49, 53 (1923) (quoting with approval the words of Chief Justice Taft in *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 447, 43 S.Ct. 190, 192, 67 L.Ed. 340, 343 (1923).)

*See also, Frank v. Assessors of Skowhegan, supra* at 174; *Sweet, Inc. v. City of Auburn, supra,* 134 Me. at 33, 180 A. at 805. The local assessors, with their special knowledge of local economic conditions, were in the best position to evaluate the effect of economic obsolescence on the value of the Shawmut Inn property. The record is clear that the assessors gave consideration to this element of depreciation, but concluded that a reduction should be given only for physical depreciation and functional obsolescence. We find their judgment controlling on this point.

■ The second contention of Shawmut Inn is that the local assessors failed to consider a serious sewerage problem which would have drastically reduced the market value of the Inn in 1975. The record does not support that contention. Abbott Pendergast, a Kennebunkport assessor, testified that the assessors were indeed aware of the sewerage problem. We can assume that the local assessors considered the problem in reaching their conclusions. *Frank v. Assessors of Skowhegan, supra* at 171.

It is the third contention of Shawmut Inn that the sale of its capital stock on April 3, 1975, is the best evidence of the market value of the Inn as of April 1, 1975. Shawmut Inn further argues that the weight of this evidence is not diminished by the fact that the sale was effected by the sale of the corporation's stock, since the subject property constituted the corporation's only substantial asset.

The sale price of property has been regarded by courts as having varying degrees of evidentiary weight in determining the property's value for tax assessment purposes. For instance, in Ohio it has been held that the best evidence of true value of real property is an actual, recent sale of the property in an arm's-length transaction. *Conalco, Inc. v. Monroe County Board of Revision,* 50 Ohio St.2d 129, 130, 363 N.E.2d 722, 723 (1977). In New Hampshire the sale price of a piece of property stands as evidence of its value in a tax abatement action unless it is found that the sale was not consummated in a fair market. *Poorvu v. City of Nashua,* 118 N.H. 632, 633, 392 A.2d 138, 139 (1978). *See also* Annot., "Sale Price of Real Property as Evidence in Determining Value for Tax Assessment Purposes," 89 A.L.R.3d 1126 (1979).

We have defined market value as the price a willing buyer would pay a willing seller at a fair public sale. *Frank v. Assessors of Skowhegan, supra* at 173. An actual

sale, we have observed, "shows what is paid, not what is the exact value. A sale may represent sentimental value or value as an investment, possible future value, or it may represent use, location, or any one or more of many things." *Sears, Roebuck & Co. v. Inhabitants of the City of Presque Isle, supra*, 150 Me. at 188–89, 107 A.2d at 479; *Sweet, Inc. v. City of Auburn, supra*, 134 Me. at 32, 180 A. at 804–05.

We agree that a recent public sale of real property is evidence of market value. *Cf. Kittery Electric Light Co. v. Assessors of the Town of Kittery, supra* at 737. The weight to be given to the sale price, however, depends upon the petitioner's ability to show that the sale price was indicative of the price a willing buyer would pay in a free and open market.

In the case before us we cannot give the April 3, 1975, sale price the controlling weight for which Shawmut Inn contends. The fact remains that the sale was consummated between shareholders in a close corporation. We have no way of knowing what price the same property might have brought had it been offered for public sale.

We conclude there has been no showing that the assessed value of the Shawmut Inn property, as reduced by the local assessors upon the Plaintiff's petition for tax abatement, was so unreasonable as to violate the constitutional mandate of justness and equality.

The Superior Court did not err in denying Shawmut Inn's appeal from the County Commissioners' refusal to grant a further abatement.

The entry will be:

Remanded to the Superior Court for entry of an order dismissing the appeal as to Assessors of the Town of Kennebunkport and Commissioners of the County of York.

Appeal denied.

Judgment affirmed.

All concurring.